WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT**

**OF ARIZONA**

| | |
|---|---|
| Brenda Corthion, | No. CV-15-00837-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, | |
| Defendant. | |

Pending before the Court is Plaintiff Brenda Corthion's appeal of the Social Security Administration's decision to deny her benefits. (Doc. 1.) For the reasons set forth below, the Court affirms the decision.

**BACKGROUND**

On September 28, 2011, Brenda Corthion filed applications for disability insurance benefits and supplemental security income, alleging various physical and mental health problems with a disability onset date of September 9, 2011. (Tr. 214–28.) On July 10, 2013, Corthion testified at a hearing before Administrative Law Judge ("ALJ") Ted W. Armbruster. (Tr. 90–130.) On October 29, 2013, the ALJ issued a decision finding Corthion not disabled. (Tr. 69–89.)

In evaluating whether Corthion was disabled, the ALJ undertook the five-step sequential evaluation for determining disability.[1] (*Id.*) At step one, the ALJ determined

---
[1] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing

that Corthion had not engaged in substantial gainful activity since her alleged onset date. (Tr. 74.)  At step two, the ALJ determined that Corthion suffered from severe impairments of "psychotic disorder, NOS; anxiety disorder, mood disorder, NOS; major depressive disorder; and right ankle degenerative joint disease, status-post reconstructive surgery."  (Tr. 75.)  At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the Social Security Administration's listed impairments.  (Tr. 77.)

At that point, the ALJ made a determination of Corthion's residual functional capacity ("RFC"),[2] concluding that Corthion could "perform light work as defined in 20 CFR § 404.1567(b) and § 419.967(b), but with the following limitations:  occasional pushing and pulling with the lower extremities; frequent climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; frequent balancing and stooping; occasional kneeling, crouching, or crawling" as well as avoiding environments with loud noise intensity and hazardous environments, not taking jobs requiring driving, and "limited to simple unskilled work with only occasional changes in the workplace and occasional interaction with the public."  (Tr. 79.)  The ALJ thus determined at step four that Corthion retained the RFC to perform her past relevant work as a companion.  (Tr. 82.)

---

supplemental security income).  Under the test:

> A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations.  If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, she is not able to perform any work that she has done in the past.  Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy.  This step-five determination is made on the basis of four factors:  the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal citations and quotations omitted).

[2] RFC is the most a claimant can do despite the limitations caused by her impairments. *See* S.S.R. 96–8p (July 2, 1996).

The ALJ reached step five, concluding that Corthion could perform a significant number of other jobs in the national economy despite her limitations. (*Id.*)

On March 11, 2015, the Appeals Council declined to review the decision. (Tr. 1–7.) Corthion filed the complaint underlying this action on May 8, 2015, seeking this Court's review of the ALJ's denial of benefits. (Doc. 1.) The matter is now fully briefed before this Court. (Docs. 17, 19, 20.)

## DISCUSSION

### I. Standard of Review

A reviewing federal court need only address the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted).

### II. Analysis

On appeal, Corthion challenges the ALJ's determination only as to her mental impairments and not as to her physical impairments. (Doc. 1 at 1 n.1.) Corthion argues that the ALJ erred by: (A) improperly giving little weight to the opinion of treating

psychiatrist Dr. England; (B) improperly giving significant weight to the opinions of state agency psychological consultative examiner Dr. Geary and state agency non-examining physicians Dr. Starace and Dr. Santulli; (C) failing to discuss Corthion's SMI determination; (D) improperly considering only part of the opinion of state agency non-examining physician Dr. Cox; and (E) improperly rejecting Corthion's symptom testimony.

### A.  Treating Source Opinion

When evaluating opinion evidence, ALJs "evaluate every medical opinion" received but generally "give more weight to opinions from . . . treating sources" because treating medical professionals can "provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from [non-treating sources]." 20 C.F.R. § 416.927(c)(2). "If . . . a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," an ALJ "will give it controlling weight." *Id.* However, if the treating physician's opinion is contradicted, the ALJ must either determine how much weight to afford it through the imposition of certain factors provided in 20 C.F.R. § 404.1527(c)(2)–(6), or, the ALJ may reject the opinion if he provides "specific and legitimate reasons that are supported by substantial evidence" for doing so. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *see Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).

Here, citing SSR 96-2p,[3] the ALJ found that the opinion of the treating physician was "unsupported by substantial evidence" and accordingly gave it "little weight." (Tr. 81–82.) The ALJ gave four reasons for so finding: (1) Corthion "has been treated on an outpatient basis since her September 2011 admission," (2) Corthion's "medical records disclose no debilitating side effects from medication," (3) Corthion's "mental status

---

[3] The ALJ's opinion incorrectly labelled the ruling as SSR 96-5p, rather than SSR 96-2p.

- 4 -

findings were generally intact," and (4) Corthion's "self-admitted activities, including [several part-time jobs,] suggest that her capacities are greater than Dr. England contends." (*Id.*)

### 1. Generally Intact Mental Status

The ALJ found Corthion's "generally intact" mental status as a reason to give less weight to Dr. England's opinion. Corthion contends that the ALJ failed to support this finding with any citations to the record. But this contention is based on a misreading of the ALJ's opinion. Initially, in his step two analysis, the ALJ cited numerous specific portions of the record referring to Corthion's mental status. (*See* Tr. 75–77.) Then, in assessing Corthion's own credibility, the ALJ wrote that Corthion's "[m]ental status examinations since her September 2011 admission, as summarized above, have generally revealed intact mental status, with good concentration and an intact memory." (Tr. 80.) Finally, in giving little weight to Dr. England's opinion, the ALJ wrote that "mental status findings were generally intact." (Tr. 82.) To be sure, the ALJ did not again set out all of the mental status findings he initially cited, but it is clear that the later finding refers back to the initial summary.

That summary cites substantial evidence in the record supporting the ALJ's finding that Corthion's mental status was generally intact. Corthion was hospitalized with paranoia, homicidal ideation, and suicidal ideation in September of 2011. (Tr. 453.) Near the end of her hospitalization, she was less disturbed by paranoia, and had no homicidal or suicidal ideation. (Tr. 439.) Upon discharge, she appeared "mildly depressed" and had "impaired" judgment and insight but was fully oriented and had "satisfactory" attention span and memory. (Tr. 467.) On follow up soon after her discharge, she was fully oriented and demonstrated appropriate mood and affect, even though she had been non-compliant with her medication. (Tr. 588–90.) Three months later, in December, 2011, although Corthion was still depressed and had a "dysphoric" and "agitated" mood, she had an appropriate affect, intact memory, fair concentration, normal speech, logical and non-psychotic thought processes, and good insight and

judgment. (Tr. 615–16.) Again, in February, 2012, Corthion was depressed, but also pleasant and cooperative with a logical and coherent thought process, being able to concentrate and remain on task. (Tr. 625.) That same month, she did report hearing voices and appeared irritable, but her thoughts were "logical" and "non-psychotic," her concentration and intellect "good," and her insight and judgment "fair." (Tr. 756–57.) In July, 2012, Corthion was examined by a state agency physician, who found her attention span and concentration satisfactory, her associations logical, and her insight "mildly limited but essentially intact." (Tr. 704.) Treatment records throughout 2013 indicate, similarly, that though Corthion was chronically depressed (Tr. 865), she was "doing well," (Tr. 833), fully oriented with appropriate mood and affect, (Tr. 871), with good concentration and intact memory, albeit with limited insight and judgment. (Tr. 840.)

Corthion argues that the *Garrison v. Colvin*, 759 F.3d 995 (9th Cir. 2014), precludes the ALJ's finding, because "it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id.* at 1017. Corthion makes a number of citations to the record, purporting to demonstrate that the ALJ's record citations were merely isolated instances of improvement, inconsistent with the generally severe nature of Corthion's symptoms. (Doc. 17 at 16.) But the majority of the reports Corthion cites are not inconsistent with those the ALJ cited—in many cases they are actually the same reports—and they do not demonstrate any kind of "cherry-picking" by the ALJ.

For example, Corthion cites a December, 2011 report as indicating that Corthion's condition was "largely unchanged" from her earlier episodes of psychosis and paranoia. (Doc. 17 at 16.) But that report indicated that though Corthion was depressed and still suffered from auditory hallucinations, her thoughts were logical and non-psychotic, her concentration, intellect, judgment and insight good, and her attitude cooperative and friendly. (Tr. 760–61.) The reports Corthion cites from 2012—including a report that the ALJ also cited—show generally the same findings, although on two occasions Corthion's judgment and insight are listed as "fair" instead of "good." (*See* Tr. 740–43,

753–54, 756–58.)  A December, 2012 report reported that Corthion's mood was angry and dysphoric and her affect blunted and constricted.  (Tr. 846–48.)  This is consistent with the December, 2011 report the ALJ cited.  (Tr. 615–16.)  So too with the reports Corthion cites from 2013—which, again, include reports cited to by the ALJ—with the main variations being several findings of judgment and insight as being "limited." (*See* Tr. 839–40, 843–45, 856–65.)

Corthion does cite two reports that seem more at odds with the substantial evidence the ALJ cited indicating that Corthion's mental status was generally intact. These reports came soon after her hospitalization in 2011, one from October and one from November, describing her as "acutely psychotic," (Tr. 537–40), and "extremely paranoid with auditory hallucinations."  (Tr. 508.)  But two reports from the period immediately following Corthion's hospitalization do not invalidate the generally consistent reports over two years that the ALJ cited.  And importantly, both reports indicate that the more severe symptoms they describe may have been related to Corthion's non-compliance with her medication.  (Tr. 508, 537.)  They thus do not directly contradict the ALJ's finding that Corthion's mental status was "generally intact." At the very least, there is still substantial evidence in the record supporting the ALJ's finding.

### 2. Conservative Treatment and Lack of Side Effects

Corthion does not contend that the ALJ's factual finding regarding Corthion's outpatient treatment was unsupported by substantial evidence.  Rather, Corthion argues that it was legal error to use Corthion's lack of inpatient treatment to call Dr. England's findings into question, on the grounds that doing so incorrectly assumes that hospitalization is a prerequisite for a finding of disability.  (Doc. 17 at 11–12.) Hospitalization is indeed not a prerequisite for a finding of disability, but the ALJ merely found that Corthion's lack of inpatient treatment was inconsistent with the level of mental impairment to which Dr. England opined.  ALJs are directed to consider how "consistent an opinion is with the record as a whole" in determining how much weight to give a

medical opinion. *See* 20 C.F.R. § 416.927(c)(4). The Ninth Circuit has repeatedly held that a relatively conservative treatment history may be considered in assessing how much weight to give allegations as to the severity of an impairment. *See, e.g.*, *Tommasetti v. Astrue*, 533 F.3d 1035, 1039–40 (9th Cir. 2008) (finding that a claimant who "responded favorably to conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset" was not credible "regarding the disabling nature of his pain"). The bulk of case law deals with conservative treatment vis-à-vis claimant credibility, rather than the weight due a treating physician's report, but the Ninth Circuit has discussed conservative treatment in the context of a treating physician's report's weight as recently as 2016, albeit in an unpublished case. *See Hanes v. Colvin*, 651 F. App'x 703, 705 (9th Cir. 2016) (holding that an "ALJ reasonably relied on conservative treatment" consisting of "minimal medication, limited injections, physical therapy, and gentle exercise" to "conclude that the assessments of [two treating physicians] were inconsistent with the objective evidence in the record"); *see also Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (finding that because a "conservative course of treatment" is "not the sort of . . . recommendation[] one would expect to accompany a finding that [the claimant] was totally disabled," the ALJ had "provided adequate reasons for not fully crediting [the treating physician's] statements").

The presence or absence of severe medication side effects is relevant to the probative value of a claimant's conservative treatment. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). A conservative course of treatment may not be probative of a lack of disability when "the claimant has a good reason"—such as serious medication side effects—"for not seeking more aggressive treatment." *Id.* But where there are no serious side effects, a conservative course of treatment is more indicative of a less severe ailment. This was therefore a permissible factor for the ALJ to consider in determining whether Dr. England's opinion was well-supported. *See Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) ("An ALJ is clearly allowed to consider . . .

the lack of side effects from prescribed medications, and the unexplained absence of treatment for excessive pain."). Moreover, there is substantial support in the record for the finding that Corthion suffered from no debilitating side effects.[4]

### 3. Inconsistency with Daily Activities

Finally, the ALJ found that Dr. England's opinion was inconsistent with Corthion's daily activities, including certain jobs she held during the period of her alleged disability. An ALJ may discount a physician's opinion to the extent it conflicts with the claimant's daily activities. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601–02 (9th Cir. 1999). Corthion, however, cites *Lingenfelter v. Astrue*, 504 F.3d 1028, 1038–39 (9th Cir. 2007), for the proposition that it is inappropriate for an ALJ to consider "failed attempts to work" in rejecting a treating physician's opinion. But *Lingenfelter* is inapposite in four key ways. In that case, the Ninth Circuit determined that a (1) "brief" period of work, (2) *after* the alleged period of disability, was (3) *by itself* insufficient to constitute (4) "clear and convincing" evidence to reject a *claimant's* testimony. *See id.* Here, though, the ALJ cited more than a year's worth of various jobs during the period of alleged disability, including "a job that required lifting and walking and 10-hour shifts" and an eight-month part-time stint as a hostess. (Tr. 80.) The ALJ never expressly found whether these jobs constituted substantial gainful activity, (Tr. 74), but even work that does not constitute substantial gainful activity may be considered in determining whether a claimant is disabled. 20 C.F.R. § 404.1571; *see Huizar v. Comm'r of Soc. Sec.*, 428 F. App'x 678, 680 (9th Cir. 2011).

This was just one of several reasons the ALJ cited in conferring "little weight" on

---

[4] Both Corthion and Defendant interpret the ALJ's opinion as assuming (erroneously, Corthion argues) that the lack of "debilitating side effects" *itself* contradicts Dr. England's opinion as to side effects, and finding Dr. England's opinion due little weight due to this contradiction. This is not the most natural reading of the ALJ's opinion. Nevertheless, Dr. England's finding of "moderate" side effects, (Tr. 855), is neither explained as requested on the very same page, (*id.*), nor supported by Dr. England's own notes. (Tr. 753, 841, 861). Thus, even reading the ALJ's opinion as the parties suggest, any error the ALJ made in characterizing Dr. England's assessment of side effects as "debilitating" was harmless. *See Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (finding treating source opinions that "were conclusory and conflicted with [the treating source's] earlier assessment" to be not well-supported).

- 9 -

1 Dr. England's opinion. Each reason discussed was a "specific and legitimate reason[]
2 supported by substantial evidence," *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995),
3 and the ALJ therefore did not err in giving Dr. England's opinion little weight.

### B.     Non-treating Source Opinion

The ALJ gave "significant weight" to the opinion of Dr. Geary, the state agency psychological consultative examiner, and "considerable weight" to the opinions of Dr. Starace and Dr. Santulli, the state agency non-examining physicians. Corthion contends that by doing so, the ALJ improperly "reverse[d] the general weight assignments for medical source opinions," did not properly explain why he was accepting the opinions of the three doctors, and credited the opinions simply "because they were supportive of his pre-determined residual functional capacity assessment." (Doc. 17 at 10, Doc. 20 at 7.)

Two of these contentions fail immediately. As a general rule, of course, the opinions of treating physicians are entitled to greater weight than those of non-treating physicians, but as discussed above, the ALJ properly provided "specific and legitimate reasons" to give little weight to Dr. England's opinion. *See Lester*, 81 F.3d at 830–31. Likewise, the ALJ did not err in failing to more fully explain why he credited the opinions of Drs. Geary, Starace and Santulli. Corthion cites *Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006), a case dealing with the *rejection* of a medical opinion, to argue that the ALJ needed to provide "clear, specific, [and] legitimate" reasons for *accepting* these opinions. (Doc. 17 at 10.) But the ALJ is under no obligation to provide reasons for interpreting and incorporating medical opinions into the RFC assessment. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010); *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

Corthion's third contention is a closer call. An ALJ may not simply make an RFC assessment and then accept whatever medical opinions agree with that assessment while rejecting those that disagree. To do so would be contrary to the directive that ALJs will "assess [the claimant's] residual functional capacity based on *all* of the relevant medical and other evidence," including "any statements . . . that have been provided by medical

1    sources." 20 C.F.R. § 404.1545 (emphasis added). It is not clear from the ALJ's opinion
2    whether he properly considered the opinions of the non-treating physicians in formulating
3    his RFC assessment or, alternatively, improperly credited the opinions because they
4    comported with his already-made RFC assessment. The ALJ wrote that Dr. Geary's
5    opinion "supports no greater restrictions than those adopted" in the RFC assessment, and
6    that Dr. Starace likewise "imposed no greater restrictions than those adopted above." (Tr.
7    81.) But he also summarized his discussion by stating that the RFC assessment was
8    "supported by the assessment of Dr. Geary, the history of conservative treatment . . . , and
9    the claimant's self-admitted activities." (Tr. 82.) Any error, however, was harmless. An
10   ALJ's error is harmless when the error is inconsequential to the ultimate non-disability
11   determination. *See Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006);
12   *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Even if the ALJ first formulated
13   his RFC assessment and then accepted the opinions of the three non-treating physicians,
14   those opinions were fully in accord with the RFC assessment and would not have
15   changed it had they been incorporated at the beginning.

16   **C.     Consideration of Dr. Cox's Opinion in the RFC Assessment**

17   The ALJ similarly incorporated aspects of Dr. Cox's opinion into the RFC
18   assessment. (Tr. 81, 715.) Corthion alleges that the ALJ erred by taking into account the
19   narrative of Section III of the RFC assessment while failing to consider the checklist of
20   Section I. (Tr. 713–15.) The correct use of the RFC assessment form is described by the
21   Program Operations Manual System ("POMS"), an internal Social Security
22   Administration document that courts have found to be persuasive but which does not
23   carry the force of law. *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1005
24   (9th Cir. 2006). The POMS says the following:

25   > The purpose of section I ("Summary Conclusion") . . . is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered
26   > each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday
27   > and workweek on an ongoing, appropriate, and independent basis. **It is the narrative** written by the psychiatrist or psychologist **in section III**
28   > ("Functional Capacity Assessment") . . . **that adjudicators are to use as the assessment of RFC**. Adjudicators must take the RFC assessment **in**

- 11 -

> **section III** and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the mental demands of past work or other work.

POMS DI 25020.010(B)(1) (emphasis in original).

The ALJ specifically referred to Dr. Cox's Section III findings that Corthion "retain[ed] the ability to understand, remember and carry out simple instructions." (Tr. 81, 715.) This was the portion of the RFC determination that the ALJ was directed by the POMS to consider. Moreover, while the ALJ did not discuss the hypothetical question Corthion's attorney posed to the vocational expert based on the Section I checklist, (Tr. 125–26), he was not required to do so. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1164–65 (9th Cir. 2001) ("An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence.").

### D. The SMI Determination

The record reflects that on November 10, 2011, Corthion was determined to qualify for "seriously mentally ill" ("SMI") services under the guidelines of the Arizona Department of Health Services/Division of Behavioral Health Services. (Tr. 670.)

> "Seriously mentally ill" means persons who as a result of a mental disorder . . . exhibit emotional or behavioral functioning that is so impaired as to interfere substantially with their capacity to remain in the community without supportive treatment or services of a long-term or indefinite duration. In these persons mental disability is severe and persistent, resulting in a long-term limitation of their functional capacities for primary activities of daily living such as interpersonal relationships, homemaking, self-care, employment and recreation.

A.R.S. § 36-550. The SMI determination found that Corthion "exhibit[ed] significant impairment in social, occupational, and everyday functioning," and "overall low functioning and impaired insight and judgment." (Tr. 670.) Corthion testified during the hearing that she had been adjudged SMI, (Tr. 114), but the ALJ did not discuss the SMI determination in his written opinion.

The ALJ "need not discuss *all* evidence presented"; rather, he must only explain why "significant probative evidence has been rejected." *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (citation omitted). The Ninth Circuit

has never held that an SMI determination is necessarily significant probative evidence. In fact, state findings of disability may be given as much or as little weight as the ALJ deems appropriate. *See Wilson v. Heckler*, 761 F.2d 1383, 1385 (9th Cir. 1985) (finding that even when a state disability standard is more rigorous than SSA standards, the Secretary "may attribute as much or as little weight to [the state's finding of disability] as she deems appropriate"); *Little v. Richardson*, 471 F.2d 715, 716 (9th Cir. 1972) (upholding district court's determination that a state finding was "in no way binding" on the Secretary). *McCartey v. Massanari*, 298 F.3d 1072 (9th Cir. 2002), cited by Corthion to show otherwise, is inapposite. *McCartey* held that disability findings by the Department of Veterans Affairs ("VA") are significant probative evidence that must be weighed. *Id.* at 1075–76. The Ninth Circuit based this holding on a number of specific similarities between the SSA and VA program. *See id.* at 1076; *see also Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 695 (9th Cir. 2009) (emphasizing that *McCartey* "explicitly relied on 'the marked similarity between [the disability programs of the VA and of the SSA]'" (alteration in original)). While Corthion asserts that *McCartey* stands for the proposition that the "findings of other agencies . . . must be considered," (Doc. 17 at 17), the Ninth Circuit has never applied *McCartey* to the findings of any other agency besides the VA.

Nor was it error for the ALJ to decide that the SMI determination was not significant probative evidence of its own force. For one, nothing in the SMI determination was inconsistent with the findings the ALJ listed from the same time period, which indicated that Corthion was generally "improved" from her September 2011 hospitalization, but that she was struggling with medication compliance and having trouble finding a job. (Tr. 75.) For another, the SMI determination did not purport to conclude that Corthion was disabled and unable to work. On the contrary, it determined that "additional services would assist the client with finding employment . . . ." (Tr. 670.) Finally, the SMI determination was internally inconsistent, indicating both that Corthion currently suffered from a "Dysfunction in Role Performance" and that she did not

currently "but may be expected to deteriorate to such a level without treatment." (Tr. 669.) For these reasons it was not error for the ALJ to fail to discuss the SMI determination.

### E. Corthion's Credibility

The Ninth Circuit utilizes a two-step analysis in determining whether a claimant's subjective pain or symptom testimony is credible. *Lingenfelter*, 504 F.3d at 1035–36. First, the ALJ must "determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036. If an underlying impairment exists, then "the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if he makes specific findings stating clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1283–84 (9th Cir. 1996). In other words, the "ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *See Morgan*, 169 F.3d at 599. "These findings, properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude that the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (internal quotation marks and citation omitted). The ALJ may consider "at least" the following factors when weighing a claimant's credibility: "[the] claimant's reputation for truthfulness, inconsistencies either in [the] claimant's testimony or between her testimony and her conduct, [the] claimant's daily activities, her work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [the] claimant complains." *Thomas*, 278 F.3d at 958–59 (internal quotations omitted). However, not all errors made in evaluating subjective complaint testimony undermine the ALJ's determination. Certain errors, or a certain degree of error, may be considered harmless. *See Batson*, 359 F.3d at 1196–97 (explaining that an ALJ's error is harmless if it does not affect his ultimate conclusion and holding that a single error in a credibility determination

was harmless because the ALJ gave numerous reasons for finding the claimant not credible that were supported by substantial evidence).

In this case the ALJ summarized Corthion's testimony as follows:

> The claimant alleges she has been disabled and unable to work since September 9, 2011, due to high blood pressure, psychosis, heart problems, mental problems, TIAs, and right ankle pain (Exs. 2E, 11E and 17E).
>
> She reported limited mental and physical abilities.  She asserted that she is unable to stand or walk for more than five to ten minutes and that she has a hard time getting along with others due to mood changes.  She is able to care for her personal needs but lacks the motivation to complete them.  She has difficulty leaving home due to depression and voices.  Her anxiety keeps her from interacting with others. (Exs. 2E, 11E and 17E).
>
> She reported limited daily activities.  She does not cook or grocery shop (Exs. 2E, 11E and 17E).  She described a typical day to include showering, watching television, eating breakfast, lunch and dinner and taking a nap[] (Exs. 6E, 14E).

(Tr. 79.)

The ALJ then found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (Tr. 79.)  The ALJ then listed reasons similar to those cited to discredit Dr. England's opinion:  (A) With the exception of her September 2011 hospital admission, Corthion had "only been counseled on an outpatient basis"; (B) Corthion's mental status examinations had generally revealed intact mental status; (C) Corthion's allegations were inconsistent with her work activity; and (D) Corthion's medication side effects were not "debilitating."  (Tr. 80.)

### 1. Outpatient Treatment and Side Effects

The ALJ noted both that Corthion had received relatively conservative treatment and that she had not suffered any debilitating side effects from medication.  Corthion attacks both the ALJ's characterization of the evidence and the legal propriety of him using it to find her less than fully credible.  Corthion objects to the ALJ's phrasing that Corthion has "only been counseled on an outpatient basis," arguing that it incorrectly implies she was merely "counseled" for her psychiatric problems and never received

treatments such as anti-psychotic medication. But while the phrase, read in isolation, may be interpreted that way, the ALJ expressly noted elsewhere in his opinion that Corthion had received medication. Read in the context of the full opinion, then, this is best read as noting that Corthion has only been treated on an outpatient, as opposed to inpatient, basis. This, as discussed above, is consistent with the record. Moreover, as discussed above, the Ninth Circuit has held that conservative treatment may be considered in finding a claimant's allegations of severe symptoms less than credible. *See Tommasetti*, 533 F.3d at 1039–40. The ALJ therefore did not err in considering Corthion's conservative treatment as a reason to find her testimony of severe mental problems less than credible.

The ALJ noted at the close of his discussion that Corthion's "medical records do not disclose debilitating side effects from medication." (Tr. 80.) As with Dr. England's report, discussed above, this finding does not directly contradict Corthion's testimony. Indeed, Corthion did not testify to *any* side effects, debilitating or otherwise, at the time of the hearing. The only discussion that possibly referenced side effects was as follows:

> [Claimant's Attorney:] So, you're taking medications?
> [Claimant:] Yes.
> [Claimant's Attorney:] You have any difficulty taking medications?
> [Claimant:] Not right now, no.

(Tr. 112.) Elsewhere in the record, as the ALJ noted, Corthion reported certain side effects such as "weight gain and twitching." (Tr. 615.)

Nevertheless, as discussed above with Dr. England's report, it was appropriate for the ALJ to consider the lack of debilitating side effects, even if there was no contradiction with Corthion's testimony, in considering whether conservative treatment is evidence of a less severe condition than that to which the claimant testifies. *See Orteza*, 50 F.3d at 750 ("An ALJ is clearly allowed to consider . . . the lack of side effects from prescribed medications, and the unexplained absence of treatment for excessive pain."). In that context, Corthion's lack of debilitating side effects bolsters the probative value of conservative treatment and serves as clear and convincing evidence to find Corthion not

- 16 -

credible.

### 2. Corthion's "generally intact" mental status

The ALJ also found Corthion "less than credible" due to finding that her examinations had revealed her mental status to be "generally intact." (Tr. 80.) "Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle*, 533 F.3d at 1161. As discussed above, the ALJ cited to numerous portions of the medical record in supporting his finding that Corthion's mental status was generally intact. These citations spanned the length of the period of alleged disability and were a fair representation of the record as a whole. Corthion testified to various severe symptoms, (Tr. 107–09, 113, 118), which the ALJ found to be contradicted by the medical record. This was sufficient to reject her testimony. *See Carmickle*, 533 F.3d at 1161.

### 3. Corthion's work activity

The ALJ also found that Corthion "carr[ied] out job duties that suggest her capacity is for work is greater than she now contends." (Tr. 80.) At the hearing, Corthion stated the following regarding after being asked why she left her hostess job:

> Because I wasn't able to function. You know, I was paranoid, you know, I would hear voices, you know, I'd get scared, and my boss would, you know, like threaten me, yell at me, you know, threaten to write me up, you know, because I'm not, you know, keeping up, you know, with the pace and being late.

(Tr. 98.)

Corthion further stated, in response to questions about her personal activities, that she was "scared being around people" and that she did not "like being around people" by herself. (Tr. 110.) Defendant argues that these statements are inconsistent with Corthion's ability to work as a restaurant hostess for 20 hours per week over an eight month period. (Doc at 19 at 5.) Corthion's testimony, however, speaks to her inability to ultimately hold the hostess job, not her inability to do it at all. That Corthion worked several different jobs during the relevant time period is not inconsistent with her testimony of difficulty functioning in social situations. Although Corthion's work history

- 17 -

served as substantial evidence that—contrary to Dr. England's assessment—she was not *severely* impaired in her ability to work, it falls short of being clear and convincing evidence that Corthion's milder testimony as to her limitations was not credible.

The ALJ therefore erred in finding Corthion's testimony not credible on this point; however, this error was harmless. An ALJ's error is harmless when the error is inconsequential to the ultimate non-disability determination. *See Stout*, 454 F.3d at 1055; *Burch*, 400 F.3d at 679. Here, in posing hypotheticals to the vocational expert, the ALJ incorporated the difficulties to which Corthion testified. (Tr. 122–24.) The ALJ's opinion, determining that Corthion could work as a companion, housekeeper, or janitor, incorporated the vocational expert's testimony. Because the ALJ incorporated into the RFC limitations similar to those to which Corthion testified, his error in rejecting her symptom testimony on this point was harmless.

## CONCLUSION

The ALJ did not commit reversible error in denying Corthion's application for benefits, and the decision is affirmed.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED**. The Clerk of Court is directed to terminate this case and enter judgment accordingly.

Dated this 6th day of January, 2017.

_____
Honorable G. Murray Snow
United States District Judge